NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                    :
DEBORAH FITZPATRICK and             :
LITORIA WRIGHT,                     :      Civil Action No. 08-299 (JAP)
                                    :
           Plaintiffs,              :
                                    :
     v.                             :
                                    :
COUNTY OF MONMOUTH;                 :      **OPINION**
MONMOUTH COUNTY                     :
CORRECTIONAL INSTITUTION;           :
WARDEN WILLIAM FRASER,              :
individually and in his official capacity; :
NEW JERSEY STATE POLICMEN'S         :
BENEVOLENT ASSOCIATION, INC.        :
LOCAL #240; PATRICK PANELLA;        :
ANTHONY ANDERSON, et al.,           :
                                    :
           Defendants.              :
_____ :

PISANO, District Judge.

Before the Court are motions for summary judgment filed by Defendants the County of Monmouth ("Monmouth County") and Monmouth County Correctional Institution ("MCCI"), Defendant Warden William Fraser (the "Warden"), and Defendants Anthony Anderson and Patrick Panella. Plaintiffs Deborah Fitzpatrick and Litoria Wright (collectively, "Plaintiffs") oppose the motions. Also before the Court is Plaintiffs' cross motion to amend the Complaint. Defendants the Monmouth County and MCCI, as well as Proposed Defendant the Monmouth County Sheriff's Office (the "Sheriff"), oppose the cross motion. For the following reasons, the Court will grant the motions for summary judgment and deny Plaintiffs' motion to amend their Complaint.

I.      **BACKGROUND**

In their Second Amended Complaint, Plaintiffs assert claims against Monmouth County and MCCI for discrimination, retaliation, and hostile workplace under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000E *et seq.* ("Title VII"), the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended ("Section 1981"), and the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.* ("NJLAD"), as well as claims for civil conspiracy and retaliation under the Conscientious Employee Protection Act, N.J.S.A. 39:19 *et seq.* ("CEPA").  They also assert claims against the Warden, Panella, and Anderson for discrimination, retaliation, and hostile workplace under Section 1981 and the NJLAD, as well as claims for civil conspiracy, retaliation under CEPA, and individual liability under the NJLAD.[1]

The claims stem from alleged discriminatory behavior on the part of Defendants. Plaintiffs Wright and Fitzpatrick are both African American females who worked as corrections officers at the MCCI facility.  As such, they were members of the Defendant the New Jersey State Policemen's Benevolent Association, Inc. Local #240 (the "PBA").  Beginning in 2003, Fitzpatrick and Wright were allegedly subjected to racial and gender discrimination at MCCI, in the form of repeated denials for requests for overtime assignments, punitive reassignments, denial of fair and equitable vacation allowances, unwanted and unsolicited exposure of pornographic materials, and general harassment consisting of derisive taunts and persistent mocking.  The alleged "ringleaders" of the general harassment suffered by the Plaintiffs appear to be Defendants Panella and Anderson, both white males corrections officers.  Plaintiffs allege that the Warden "turned over many of his supervisory and administrative functions" to Panella and Anderson.  (Compl. ¶ 19.)  Therefore, according to Plaintiffs, and by virtue of their leadership positions with the PBA, Panella and Anderson "had the responsibility for determining

---

[1]     On August 24, 2009 the Court dismissed Plaintffs' Section 1981 claim against the PBA.

and directing overtime assignments, vacation assignments, shift assignments, and to direct employees relative to other terms and conditions of employment." (Compl. ¶¶ 14, 15.)

In the Complaint, Plaintiffs recite a variety of episodes between March of 2006 and November 2007 demonstrating the discriminatory and hostile environment that existed at MCCI, most of which the Court will not address here. However, the Plaintiffs allege that they were removed from posts in favor of white male corrections officers, that they were reassigned to less desirable posts out of the rotation order in violation of PBA rules, that they were denied overtime assignments and PBA days[2] in a discriminatory fashion, that the Plaintiffs were continuously subjected to racial harassment, and were subjected to retaliation for routinely submitting written reports complaining of harassment by white, male coworkers and supervisors. Specifically, Fitzpatrick alleges that Panella and Anderson repeatedly taunted her, telling Plaintiff that she was "stupid" and a "monkey," and at times even imitating chimpanzees and monkeys when she entered the dining hall. (Compl. ¶¶ 37-39.)

The Plaintiffs also allege that the PBA acted arbitrarily towards them. For example, Fitzpatrick made an errant comment comparing the Union to "gang-type behavior." Fitzpatrick was disciplined for expressing this opinion. (Compl. ¶ 34.) In addition, on November 30, 2007, Fitzpatrick received a letter from Panella that she had been suspended as a member of the PBA, stating "'charges would be brought in the near future.'" (Compl. ¶ 47.) All of Fitzpatrick's PBA benefits were suspended since that time, although her dues continued to be deducted from her paycheck.

---

[2]  "A PBA day is a day provided to Union Members by the county. The president is permitted to provide these days for employees to handle union business." (Compl. ¶ 20.) Apparently, Panella regularly provided PBA days even when the recipient was not tending to union business. (Compl. ¶ 20.)

The terms and conditions of the Plaintiffs' employment are covered by the collective bargaining agreement between MCCI and the PBA, which states that neither MCCI nor the PBA will discriminate against any employee on the basis of, *inter alia*, race or gender. (Compl. ¶ 134.) Under Article 25 of the agreement, grievances regarding discrimination should "be submitted to the appropriate administrative agency having jurisdiction over the subject matter of the Complaint." (Defs.' Mot. Dismiss, Ex. B at 38.)

Defendants filed their motions for summary judgment on January 14, 2011. Plaintiffs opposed each motion, and filed a cross motion to amend their Complaint to include the Monmouth County Sheriff's Office as an additional party. The Court decides the motions without oral argument as provided in Fed. R. Civ. P. 78.

## II.    STANDARD OF REVIEW

To prevail on a motion for summary judgment, the moving party must establish "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The district court must determine whether disputed issues of material fact exist, but the court cannot resolve factual disputes in a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

In determining whether a genuine issue of material fact exists, the court must view the facts in the light most favorable to the non-moving party and extend all reasonable inferences to that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); *Stephens v. Kerrigan,* 122 F.3d 171, 176-77 (3d Cir. 1997). The moving party always bears the initial burden of demonstrating the absence of a genuine issue of material fact, regardless of which party ultimately would have the burden of persuasion at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once the moving party has met its opening burden, the non-moving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* at 324. Thus, the non-moving party may not rest upon the mere allegations or denials of its pleadings. *Id.* "[T]he plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

Once the moving party has demonstrated to the court the absence of a material fact at issue, the Supreme Court has stated that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts...." *Matsushita,* 475 U.S. at 586-87 (citations omitted). In other words, "[i]f the evidence [submitted by the non-moving party] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted).

The Supreme Court has specifically recognized that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupportable claims or defenses, and [ ] that [the rule] should be interpreted in a way that allows it to accomplish this purpose." *Celotex,* 477 U.S. at 323-24. Thus, "[w]hen the record is such that it would not support a rational finding that an essential element of the non-moving party's claim or defense exists, summary judgment must be entered for the moving party." *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 341 (3d Cir. 1990).

**III.     DISCUSSION**

    **A.     Monmouth County and MCCI**

Title VII, at 42 U.S.C. § 2000e-2(a), provides that "[i]t shall be an unlawful employment practice for an employer" to discriminate based on an individual's race, color, religion, sex, or national origin.  Thus, Title VII requires that the entity sought to be charged with liability is an employer of the plaintiff.  *Walters v. Metro. Educ. Enterprises, Inc.*, 519 U.S. 202, 205, 117 S. Ct. 660, 663 (1997).  When the entity sued by the plaintiff was not his or her employer, dismissal is appropriate.  *See Ponton v. AFSCME*, 395 Fed. Appx. 867, 872 (3d Cir. 2010) ("The District Court properly granted the Federal defendants' motions to dismiss, as Ponton was never an employee of the federal agencies that he named to this suit.").

Likewise, liability in an employment-based claim under the NJLAD can only attach if an employer-employee relationship exists between the plaintiff and defendant.  *See Chrisanthis v. County of Atlantic*, 825 A.2d 1192, 1195 (N. J. Super. Ct. App. Div. 2003), *cert. den.* 178 N.J. 31 (2003) (explaining that NJLAD requires employer-employee relationship).  Failure to find such a relationship properly allows a court to grant summary judgment in favor of the entity being sued. *Id.* at 1202.  An employer-employee relationship must similarly exist to prevail on a retaliation claim under CEPA.  *See generally Feldman v. Hunterdon Radiological Associates*, 901 A.2d 322 (N.J. 2006) (comparing employer-employee relationship requirement of NJLAD and CEPA).

The Third Circuit has explained that, "[i]n order to determine whether a person is an employee for purposes of Title VII, the common law of agency and the traditional master-servant doctrine applies."  *Prather v. Prudential Fox & Roach*, 326 Fed.Appx. 670, 672 (3d Cir. 2009)

(citing *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322–24 (1992)). The Third Circuit has provided the following factors to consider if an employer-employee relationship exists:[3]

> the hiring party's right to control the manner and means by which the product is accomplished [;] ... the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Id.* New Jersey has adopted similar factors for determining if an employer-employee relationship exists under the NJLAD:

> (1) the employer's right to control the means and manner of the worker's performance; (2) the kind of occupation-supervised or unsupervised; (3) skill; (4) who furnishes the equipment and workplace; (5) the length of time in which the individual has worked; (6) the method of payment; (7) the manner of termination of the work relationship; (8) whether there is annual leave; (9) whether the work is an integral part of the business of the "employer;" (10) whether the worker accrues retirement benefits; (11) whether the "employer" pays social security taxes; and (12) the intention of the parties.

*Pukowsky v. Caruso*, 711 A.2d 398, 404 (N.J. Super. Ct. App. Div. 1998). Several of the factors overlap; indeed, New Jersey courts have concluded that "these tests are substantially similar," and principled application of either inexorably leads to the same conclusion. *Id.* If the "overwhelming balance of factors clearly supports the . . . finding that plaintiff was not an employee," then judgment in favor of the employer is appropriate. *Id.*

In the instant case, Monmouth County and MCCI seek summary judgment that they were not Plaintiffs' "employer" under the relevant tests and, therefore, Plaintiffs may not continue

---

[3] The Court notes that the Third Circuit is quoting directly from the factors listed by the Supreme Court in *Darden* during an ERISA case. As the Third Circuit explained, however, "the statutory language [in ERISA and Title VII] is identical. Furthermore, the Supreme Court has applied *Darden* in other employment discrimination contexts where the statutory definition of employee is the same as that in ERISA." *Prather*, 326 Fed. Appx. at 672.

7

their action against them under Title VII, the NJLAD, or CEPA. The Court agrees with Monmouth County and MCCI that Plaintiffs were not their employees under the relevant tests. Though a few factors indicate that Monmouth County or MCCI was the employer – Monmouth County furnishes the workplace, for example – the overwhelming balance of factors clearly supports that the Sheriff was instead the employer, to the exclusion of Monmouth County or MCCI. By operation of statute, the Sheriff, rather than Monmouth County or MCCI, has the right to control the means and manner of Plaintiffs performance. *See* N.J.S.A. 30:8-17 ("[T]he sheriff of every county shall have the care, custody and control of the county jail or jails and all prisoners therein, and shall be responsible for the conduct of any keeper appointed by him."). The same statute shows that correctional officers like the Plaintiffs in the instant case perform work that is regular and integral to the Sheriff. *See id.* The skill required to be a correctional officer is more specifically relevant to the Sheriff than to Monmouth County. As to the intention of the parties, the collective bargaining agreement signed by Plaintiffs' union, the PBA, and the Sheriff declares the Sheriff as the employer, who will direct the affairs of MCCI and control operation, personnel changes, and regulations at MCCI. *See* Grasso Jones Declaration, Exh. D, Art. 4 (Docket Entry no. 82-7). Accordingly, neither Monmouth County nor MCCI were Plaintiffs' "employer" for purposes of their Title VII, NJLAD, and CEPA claims. Monmouth County and MCCI's motion for summary judgment will be granted and they will be dismissed from the action.[4]

---

[4] The Court notes that Plaintiffs had also submitted a claim for civil conspiracy against Monmouth County and MCCI. "In New Jersey, a civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Banco Popular North America v. Gandi*, 876 A.2d 253, 263 (N.J. 2005). Accordingly, because summary judgment will be granted in favor of Monmouth County and MCCI on the underlying claims of unlawful acts or commission of a lawful act by unlawful means, the claim for civil conspiracy is likewise

Plaintiffs attempt to remedy this by filing with the Court a cross motion to amend their Complaint, adding the Sheriff as a party in all places where Monmouth County or MCCI is mentioned. This attempt must fail, however, because Plaintiffs' delay in amending their Complaint in this matter is unreasonable. Plaintiffs claim that their failure to include the Sheriff was a simple mistake. It is undisputed, however, that Plaintiffs were advised over two years ago that MCCI was not Plaintiffs' employer, but rather the Sheriff was. Monmouth County and MCCI 56.1 Statement ¶13; *see* Warden Answer ¶11 (Docket Entry no. 24-1) ("Neither Plaintiff herein has ever been 'employed' by The Monmouth County Correctional Institution. Upon information and belief, both plaintiffs herein are or were employees of the Monmouth County Sheriff's Office, Department of Corrections."). This advisement occurred well before any deadline to amend pleadings, such that Plaintiffs had ample time to correct their mistake. Such a delay is unreasonable. *See Lorenz v. CSX Corp.*, 1 F.3d 1406 (3d Cir. 1993) (finding three-year period after original filing and two-year period after second amendment an unreasonable time to wait to amend a complaint when the plaintiffs had opportunities to amend earlier). Accordingly, Plaintiffs' motion to amend the complaint will be denied.

**B.      The Warden**

Under the NJLAD, it is unlawful for an "employer" to discriminate with respect to the terms of an individual's employment. N.J.S.A. 10:5-12(a). To the extent the Warden was a supervisor at Plaintiffs' employer, individual supervisors do not qualify as "employers" such that they may be liable under N.J.S.A. 10:5-12(a). *Cicchetti v. Morris County Sheriff's Office*, 947 A.2d 626, 645 (N.J. 2008) ("[T]he plain meaning of the definition of employer in the LAD does

---

resolved in favor of Monmouth County and MCCI. For this reason, Plaintiffs' civil conspiracy claims are also resolved in favor of all other defendants for whom the Court grants summary judgment in this Opinion.

9

not include a supervisor.").[5]  Accordingly, "[i]ndividual liability of a supervisor for acts of discrimination or for creating or maintaining a hostile environment can only arise through the 'aiding and abetting' mechanism that applies to 'any person' [in] N.J.S.A. 10:5-12(e)." *Id.*

N.J.S.A. 10:5-12(e) provides that it is unlawful "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." New Jersey courts have "held that the words aiding and abetting require active and purposeful conduct." *Cicchetti*, 947 A.2d at 645.  Active and purposeful conduct may include "knowing and willful inaction." *Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 129 (3d Cir. 1999).  If a plaintiff does not provide evidence of willfulness when an alleged aider or abettor fails to respond to complaints, however, then the plaintiff's claims fail. *See Cicchetti*, 947 A.2d at 646 ("[A]lthough there is evidence that [supervisors] failed to act so as to protect plaintiff or effectively respond to his complaints of discrimination, . . . the acts and failures to act that plaintiff attributes to the [supervisors] fall well short of the 'active and purposeful conduct,' that we have held is required to constitute aiding and abetting for purposes of their individual liability." (internal citations omitted)).

Plaintiffs contend that the Warden's failure to protect them from harassment, discrimination, and retaliation amounted to willful or deliberate inaction.  Yet while Plaintiffs make assertions and provide evidence of inaction on the part of the Warden with regard to their complaints, they provide no evidence of the Warden's willfulness.  Although there may have been inaction by the Warden after receiving complaints from Fitzpatrick, there is no evidence that such inaction was willful.  Turning to Plaintiffs' specific examples, there is no evidence the

---

[5]    Because individual supervisors do not qualify as "employers" such that they may be liable under N.J.S.A. 10:5-12(a), Plaintiffs' claims against the Warden, Panella, and Anderson under Counts VII, VIII, and IX, such that they do not claim those defendants' individual liability, fail. Instead, the Court addresses below whether these defendants are individually liable, as alleged in Count X of Plaintiffs' Complaint.

Warden's failure to intervene when Fitzpatrick was refused sick leave was deliberate. In fact, Fitzpatrick has admitted that the Warden was not even present during that event. Laughlin Declaration, Exh. F, 409:21-410:23 (Docket Entry no. 81-12). Furthermore, Fitzpatrick admits that the Warden did not personally participate in any of the alleged acts of discrimination. *Id.* Wright claims that the Warden failed to act when Wright complained that she was discriminated against in her removal from her post. She further claims that circumstantial evidence shows that the inaction was willful. This evidence includes the fact that junior officers were awarded positions over Wright, a senior officer. Yet because seniority played no part in awarding the positions, *see* Warden Cert. ¶17 (Docket Entry no. 81-3), Wright fails to provide the requisite support for a showing of willfulness. Accordingly, the Court must grant summary judgment on the aiding and abetting NJLAD claims to the Warden.

Under 42 U.S.C. § 1981, individual liability can be found only where a defendant was "personally involved in the discrimination . . . and if they intentionally caused the [employer] to infringe on [plaintiff's] Section 1981 rights, or if they authorized, directed, or participated in the alleged discriminatory conduct." *Al-Khazraji v. Saint Francis College*, 784 F.2d 505, 518 (3d Cir. 1986). As shown above, there is no evidence to show willfulness or intent on the part of the Warden with regard to discriminatory conduct, and Fitzpatrick herself admitted that the Warden did not personally participate in any of the alleged acts of discrimination. Laughlin Declaration, Exh. F, 409:21-410:23. Plaintiffs' evidence in support of their contention that the Warden was personally involved in discrimination against Wright consists of nothing more than conjecture that his personnel decisions were influenced by Panella. Wright also claims that her being passed over for a post in favor of two white males is evidence of the Warden's personal discriminatory conduct; but beyond her seniority, which was not a factor, Wright can provide no

11

support why the posting was discriminatory.  Thus, Plaintiffs have failed to produce evidence that shows the Warden was personally involved in any discriminatory conduct and summary judgment must be granted in the Warden's favor on the Section 1981 claims.

New Jersey courts have recognized that in order to make out a cause of action under CEPA, a plaintiff must establish the following four elements:

> (1) that he or she reasonably believed that his or her employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law; (2) that he or she performed whistle-blowing activity described in N.J.S.A. 34:19-3a, c(1) or c(2); (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

*Kolb v. Burns*, 727 A.2d 525, 530 (N.J. Super. Ct. App. Div. 1999).  In the instant case, Plaintiffs have failed to identify any whistle-blowing activity they performed, much less any causal connection between such an activity and any adverse employment action.  Plaintiffs have failed to respond to the Warden's arguments regarding summary judgment on the CEPA claim.  Accordingly, summary judgment must be granted in favor of the Warden on the CEPA claim as a matter of law.

After the Court's analysis, the Warden's entire motion for summary judgment will be granted and he will be dismissed from the action.

    **C.**    **Panella and Anderson**

Panella and Anderson can fairly be said to exercise supervisory roles over Plaintiffs because their positions within the PBA made them responsible for carrying out the terms of overtime and vacation assignments pursuant to the terms of the collective bargaining agreement.  As stated above with respect to the Warden, individual supervisors do not qualify as "employers" such that they may be liable under N.J.S.A. 10:5-12(a).  *Cicchetti*, 947 A.2d at 645.  Rather, "[i]ndividual liability of a supervisor for acts of discrimination or for creating or maintaining a

hostile environment can only arise through the 'aiding and abetting' mechanism that applies to 'any person' [in] N.J.S.A. 10:5-12(e)." *Id.*

For an employee to be liable for aiding and abetting discrimination under the NJLAD, "'(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; and (3) the defendant must knowingly and substantially assist the principal violation." *Tarr v. Ciasulli*, 853 A.2d 921, 929 (N.J. 2004). A supervisor may be found liable for aiding and abetting his own conduct by performing discriminatory conduct and failing to prevent it in his capacity as a supervisor. *Hurley*, 174 F.3d at 126.

Similarly, individual liability can be found under Section 1981 where a defendant was "personally involved in the discrimination . . . and if they intentionally caused the [employer] to infringe on [plaintiff's] Section 1981 rights, or if they authorized, directed, or participated in the alleged discriminatory conduct." *Al-Khazraji*, 784 F.2d at 518. Therefore, to survive summary judgment on the NJLAD and Section 1981 claims against Panella and Anderson, Plaintiffs must provide evidence that is significantly probative, and not merely colorable, that Panella and Anderson committed discriminatory acts.

Plaintiffs list many alleged instances to provide evidence of discrimination on the part of Panella and Anderson, but each instance fails to show that Panella and Anderson did, in fact, participate in illegal discriminatory conduct. Plaintiffs, for example, allege many instances of intimidating remarks toward them that are directed toward no protected class. *See, e.g.*, Pl. Opp'n at 3 (stating that Panella was heard to say that a disliked boss was gone ,"but now we have his niece."). The fact that Anderson addressed an envelope to Fitzpatrick as "Fitzfatrick," if not

13

accidental, does not necessarily refer to her gender, as Fitzpatrick herself admits. *See* Fitzpatrick Deposition, Kitrick Cert., Exh. E (Docket Entry no. 83-7) (acknowledging that "Fitzfatrick" did not include an extra "t" so as to form "fat" and "trick," a slang word for prostitute). Plaintiffs then claim they were discriminated against during the assignment of vacation, overtime, and post positions, but they provide no evidence that racial or sex-based animus motivated the assignments.

Plaintiffs claim that a hostile work environment was created when Panella and Anderson allegedly resorted to discriminatory taunting and name-calling, including referring to Plaintiffs as "monkeys," making monkey sounds in their presence, and making crying noises in their presence. Fitzpatrick, however, admits that the one time she was called a monkey, over the radio, she did not know who it was who said that. Fitzpatrick Deposition, Kitrick Cert., Exh. F (Docket Entry no. 83-8). The monkey sounds, allegedly made after her name was called during a typically raucous roll call, were attributed to Panella by voice alone, but Fitzpatrick also admits that she could not identify who said "monkey" over the radio because "I don't do voice recognition." Tarver Declaration, Exh. J at 189 (Docket Entry no. 97-12). Significantly, the sounds were left out of an investigative report on the roll call in question in favor of a completely different complaint that someone said "Who?" directly after her name. *See* Inv. Report, Laughlin Cert., Exh. M (Docket Entry no. 81-19). Plaintiffs have not provided evidence as to why any crying noises would be discriminatory. Accordingly, the complained of conduct cannot be said to be probative of discriminatory conduct by Panella and Anderson. Therefore, the Court must grant summary judgment in favor of Panella and Anderson with regard to the Section 1981 and NJLAD claims.

As with the Warden, Plaintiffs have failed to identify any whistle-blowing activity that Plaintiffs performed, much less any causal connection between such an activity and any adverse employment action, to prove their CEPA claim. Plaintiffs have failed to respond to Panella and Anderson's arguments regarding summary judgment on the CEPA claim. Accordingly, summary judgment must be granted in favor of Panella and Anderson on the CEPA claim as a matter of law.

After the Court's analysis, Panella and Anderson's entire motion for summary judgment will be granted and they will be dismissed from the action.

### IV.    CONCLUSION

The Court concludes that Monmouth County and MCCI were not "employers" of the Plaintiffs and will grant summary judgment in their favor on all claims against them. The Court will also deny Plaintiffs' motion to amend their Complaint because of undue delay. The Court further concludes that Plaintiffs have failed to produce the requisite evidence that the Warden, Panella, or Anderson aided or abetted discrimination or otherwise performed discriminatory conduct such that Plaintiffs' claims cannot survive a motion for summary judgment.


/s/ JOEL A. PISANO
United States District Judge

Dated: June 30, 2011